J-S12043-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: Z.R.H., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.P.H., FATHER | : | No. 1964 MDA 2018 |

Appeal from the Decree Entered October 24, 2018
in the Court of Common Pleas of Huntingdon County
Orphans' Court at No(s):  31-18-0018

BEFORE:  BOWES, J., DUBOW, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:          **FILED: MARCH 28, 2019**

B.P.H. ("Father") appeals from the Decree granting the Petition filed by Huntingdon County Children and Youth Services Agency ("CYS" or "the Agency") to involuntarily terminate his parental rights to his minor child, Z.R.H. ("Child"), a male born in November 2016, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(5), (8), and (b).[1]  We affirm.

The trial court set forth the relevant procedural history as follows:

3. By Order dated January 18, 2017, the Honorable George N. Zanic, President Judge of the Court of Common Pleas of Huntingdon County, Pennsylvania, granted emergency protective custody of [Child] to the Agency.  42 Pa.C.S.A. [§] 6324(1).

4. The Order stated that the facts which were the basis of the Order were:

---

[1] In the same Decree, the trial court involuntarily terminated M.R.'s ("Mother") parental rights to Child.  Mother is not a party to the instant appeal, nor has she filed an appeal from the Decree terminating her parental rights.

1. [Mother] admitted to an Agency caseworker that over the weekend of January 13, 2017, she made a comment that she had thoughts [of,] and verbally stated she wanted to smother [Child].

2. [Mother] reported that [Father] was bipolar and does not consistently take his medication.

3. [Father] has commented that[,] if [Child] were to reside with him, he would hit [Child] with a belt if he started to cry.

4. The maternal grandmother[,] who lives in the home and has been the primary caretaker of [Child,] has indicated she is physically and mentally exhausted and is having trouble keeping up with the care of [Child].

…

6. A dependency Petition was filed simultaneously with the emergency protective custody Order.

7. An amended dependency Petition was filed on January 20, 2017.

8. In both [P]etitions[,] the legal basis for dependency was that [Child] was[] "without proper parental care or control, subsistence, education as required by law or other care or control necessary for his physical, mental or emotional health or morals[.]" 42 Pa.C.S.A. [§] 6302(1).

9. The factual basis stated in the [P]etition for dependency was the same as set forth above in the emergency protective custody Order.

10. Safety was therefore the motivating reason the Agency sought dependency.

11. The Agency placed [Child] in the home of a cousin of [Mother].[FN]

[FN] The foster parents, [T.F. and H.F. ("Foster Mother"),] have indicated a willingness to adopt [Child].

12. Following a hearing held [on] February 6, 2017, [Child] was declared to be dependent by President Judge Zanic.

13. Judge Zanic ordered, *inter alia*:

[Father] is strongly encouraged to participate in individual counseling. The Agency will receive written and/or verbal progress reports regarding progress and participation.

…

[Father] shall participate in and successfully complete an Agency[-]approved parenting program. Written and/or verbal progress reports shall be given to the Agency.

It is strongly recommended that [Father] participate in a mental health evaluation. Written and/or verbal reports shall be provided to the Agency.

Trial Court Opinion, 10/24/18, at 2-5 (footnote in original).

On May 4, 2018, CYS filed a Petition to involuntarily terminate the parental rights of Father to Child. The trial court held an evidentiary hearing on the Petition on August 31, 2018.[2] In its Findings of Fact, the trial court set forth the relevant testimony as follows:

15. [Emily Dixon ("Dixon"), the CYS caseworker assigned to Child's family,] testified that the substantive issues in the case were dealt with by Raystown Developmental Services (RDS).

---

[2] On July 5, 2018, the trial court granted the Agency's Motion for appointment of counsel for Child pursuant to *In re Adoption of L.B.M.*, 161 A.3d 172, 179-80 (Pa. 2017) (plurality) (requiring that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding). The trial court appointed Erica Shoaf, Esquire ("Attorney Shoaf"), as Child's legal counsel. Attorney Shoaf was present at the termination hearing, as was Michael M. Kipphan, Esquire, guardian *ad litem* ("GAL") for Child.

16. [Dixon] opined that no progress ha[d] been made in this case with respect to correction of the issues that led to placement and dependency.

17. [] Dixon acknowledged, in response to a question from [Father's] attorney, that the Agency records reflected that [Father] had attended eight (8) anger management sessions at Mainstream Counseling, Huntingdon, Pennsylvania.

18. [Dixon], however, added that Mainstream reported that [Father] just went through the motions and did not give any indication that he had gained any positive help for his anger.

19. [] Dixon also acknowledged receipt of an "Interim Summary" dated June 19, 2018, from Cornerstone Community Services regarding [Father].

20. The report indicated that [Father] had been referred for counseling … "due to struggling with anger management issues[.]"

…

22. Also, [Dixon] said, there was a good relationship between [Mother] and the [F]oster [M]other.

…

24. Finally, [] Dixon testified that part of her role was to check in periodically at the foster home.

25. [Dixon testified,] "[W]hen I go to the foster home[,] I see this beautiful, blue-eyed[,] blond[-]haired baby who is smiling and laughing and happy to see me[.]" (N.T., at p. 114.)

26. [] Trista Mitchell [("Mitchell")] testified [that] she is the Family Service Director for RDS.

27. [Mitchell] has twenty (20) years' experience in the field of children's social work.

28. Initially, [Mitchell] testified, this case was assigned to a reunification caseworker who scheduled visits with the parents and [Child] in their home.

29. For safety reasons, the visitations were quickly moved to the RDS offices.

30. The event precipitating this change was a statement made to the reunification caseworker by [Father] in a curse[-]laden tirade that he hoped she would die.

31. This and similar conduct on the part of [Father] prompted Judge Zanic[,] on May 5, 2017, at a permanency hearing, to suspend [Father's] visitation with [Child] until a mental health professional provided the [trial court with] evidence that it would be safe to continue his visitation with [Child].

32. [Father] has never provided [the trial court] with any evidence that it would be safe for [Child] and the RDS staff for [Father] to visit with [Child].

33. Hence, there has been no contact between [Father] and [Child] for sixteen (16) months.

34. [] Mitchell testified that[,] on April 10, 2017, for a variety of reasons, this case was transferred from the RDS Reunification Program to the Family Connections Program[,] which she indicated was a step backward in reuniting this family.

…

37. [Mitchell] said that[,] in addition to the safety concerns created by [Father], she became personally involved in the case because of the very low capabilities of [M]other.

38. She reported that [Mother] was unable[,] without help[,] to perform the most basic tasks for [Child,] including holding him, feeding him and changing him.

39. The visits of [Mother] with [Child] were generally supervised by the [F]oster [M]other and [] Mitchell.

40. In this regard, [] Mitchell said that[,] if the [F]oster [M]other was not in the room, [Child] would cry the entire time.

…

46. [] Mitchell reported that[,] on multiple occasions[,] [Mother] told her [that Father] physically assaulted her, screamed at her and withheld food from her.

…

50. [Child] is[,] however[,] bonded to his [F]oster [M]other, according to [] Mitchell, and is a happy-go-lucky[,] secure little boy in [Foster Mother's] home.

…

63. At the request of the Agency[,] Terry O'Hara, Ph.D. [("Dr. O'Hara")], evaluated the parents on March 30, 2017.

64. [Dr. O'Hara's] initial twenty-four (24)[-]page report was received into evidence at [the termination] hearing as Agency Exhibit 1.

65. Dr. O'Hara re[-]evaluated [Father] on December 18, 2017.

66. The report generated by the re[-]evaluation was received into evidence as Agency Exhibit 2.

67. Dr. O'Hara[, who participated in the hearing via telephone,] placed on the record the types of testing he conducted with the parents[,] and he also testified that he conducted a clinical interview and observed the parents with [Child].

68. According to Dr. O'Hara, [Father's] IQ was in the normal range and that [*sic*] there was no evidence of cognitive limitations.

69. Also, on a positive note, Dr. O'Hara reported there were no issues of substance abuse [as to Father].

70. However, Dr. O'Hara testified that [Father] has been diagnosed with Bipolar II Disorder[,] which he said is a major mental disorder.

71. Dr. O'Hara's testing, he said, confirmed this diagnosis and he recommended to [Father] that [Father participate in weekly mental health treatment with an anger management component.

72. Dr. O'Hara said that both parents presented with unaddressed mental health concerns [and] relationship issues[,] and that both parents had significant difficulty in being able to calm and soothe [Child].

73. Dr. O'Hara expressed serious concern with regard to [Father] managing [Child] in an unsupervised setting.

74. Dr. O'Hara opined that it would be unsafe to leave the baby in the unsupervised care of [Father,] and he therefore strongly advised against it.

75. At the second evaluation of [Father] in December[] 2017, Dr. O'Hara reported the same testing was done as at the first evaluation.

76. [Dr. O'Hara] said he conducted a clinical interview and reviewed a lot of collateral material provided to him by the Agency.

77. Dr. O'Hara testified that [Father] told Dr. O'Hara that he had completed eight (8) sessions of anger management. (**See** Findings of Fact 17, 18.)

78. [Father] also reported [attending] counseling[,] since September[] 2017, at Bedford-Somerset Developmental & Behavioral Services ….

79. Dr. O'Hara said [Father] admitted to him [incurring] a conviction for disorderly conduct since the last evaluation.

80. [Father] also admitted telling a[n] RDS caseworker that he wished she were dead.

81. Finally, Dr. O'Hara reported that [Father] told him that Judge Zanic had thrown him out of his courtroom for remarks he made.

82. Dr. O'Hara concluded that [Father] had made no appreciable progress since the first evaluation.

83. Also, [Dr. O'Hara] said, [Father] refused to acknowledge any responsibility for his circumstances, a fact, [Dr. O'Hara] said, that negated any motivation to change.

84. Dr. O'Hara advised against contact between [Child] and [Father] until [Father] was able to demonstrate meaningful progress in anger management treatment.

…

87. Dr. O'Hara reported that [Mother] said [Father] yelled at her a lot, would not help around the house[,] and mostly slept all day.

88. [Mother] told [Dr. O'Hara] she was afraid of [Father].

…

100. Neither parent testified at the termination hearing.

101. The GAL placed his support of termination on the record following testimony.

102. [Attorney Shoaf] … placed on the record her observations[,] which corroborated the testimony presented by the Agency. She said:

> "MS. SHOAF: Judge, it is a little difficult for me to provide what I'm supposed to, to provide to the [c]ourt [Child's] desires. But in lieu of that, I would like to just make a brief report as to what I have observed. I did attend a meeting in the foster home to meet with the [F]oster [M]other and [Child]. I was there for approximately an hour. And during that time [Child] was a very happy child. [Child] frequently sought out … [F]oster [M]other, as his care giver [*sic*]. [Child] sought her approval for the action that he was doing and interacted very well with her. [C]hild also warmed up to me and asked me to pick him up [] several times and hold him.
>
> This was a stark contrast to the child that I observed a few weeks later in the supervised visit with [Mother]. I was present for the visit that [] Mitchell testified about that occurred on August 22[, 2018,] during which … [F]oster Mother[] left the room for ten minutes, during which [Child] cried the entire time. It was distressing to me. … And[,] [Child] was comforted when [Foster Mother] returned to the room. [Child] became less fussy and sought [Foster Mother] for comfort.

And[,] based on what I have observed of [Child], he is extremely comfortable with his [F]oster [M]other and his foster home. I will leave it at that."

(N.T., at pp. 116, 117.)

103. Termination of the parental rights of [Mother] and [Father] with respect to [Child] would best serve the needs and welfare of [Child].

Trial Court Opinion, 10/24/18, 4-21.

On October 24, 2018, the trial court entered the Decree terminating Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(5), (8), and (b). On November 21, 2018, Father timely filed a Notice of Appeal, along with a Concise Statement pursuant to Pa.R.A.P. 1925(a)(2)(ii) and (b).

On appeal, Father raises the following issue for our review:

Whether the trial court lacked competent evidence to support the court's inferences or conclusions of law that [the Agency] proved, by clear and convincing evidence, grounds for termination under 23 Pa.C.S.[A.] § 2511(a)(8) or (a)(5)[?]

Father's Brief at 4.[3]

_____

[3] Father waived any challenge to the sufficiency of the evidence to support the termination of his parental rights under section 2511(b), as he did not challenge section 2511(b) in either his Concise Statement or the Statement of Questions Involved portion of his brief. *See Krebs v. United Ref. Co. of Pa.*, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his concise statement of errors complained of on appeal and the statement of questions involved in his brief on appeal). Nevertheless, we will discuss the sufficiency of the evidence supporting the termination of Father's parental rights under section 2511(b), as the trial court considered Child's best interest in its Opinion.

Father challenges the sufficiency of the evidence presented by the Agency. *See id.* at 10-13. Father also asserts that the trial court failed to properly consider that he was engaging in recommended anger management treatments. *Id.* at 12.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (internal citations omitted).

- 10 -

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. **In re R.N.J.**, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" **Id.** (quoting **In re J.L.C.**, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a), along with consideration of section 2511(b). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we will consider subsections 2511(a)(8) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

- 11 -

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

To terminate parental rights pursuant to section 2511(a)(8), it must be demonstrated that "(1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa. Super. 2003). Once the 12-month period set forth in subsection (a)(8) has been established, the trial court must next determine whether the conditions necessitating placement persist, despite the reasonable good-faith efforts the agency supplied over a realistic period of time. *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003).

The focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See in re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [533 Pa. 115, 121, 620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). A parent's abuse and neglect are likewise a relevant part of this analysis:

[C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent …. Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In the Matter of S.B.*, 943 A.2d 973, 978 (Pa. Super. 2008) (stating that "[s]afety, permanency, and well-being of the child must take precedence over **all** other considerations." (citation omitted; emphasis in original)); *see also In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (stating that "a parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment.").

In its Opinion, the trial court detailed its considerations in terminating Father's parental rights under section 2511(a)(8), and considered Child's best interests as follows:

> We consider first the Agency claim that the parental rights of [Mother and Father] should be terminated pursuant to subsection 2511(a)(8). …
>
> In this case, the Agency has easily met its burden of proving as [*sic*] a basis for termination under Section 2511(a)(8). There is no dispute that [Child] has been removed from the care of his parents for more than twelve (12) months. Nor is there any dispute that the conditions that led to placement have not been remedied. [Father], by his conduct, dropped out of the process four (4) months after it began[,] and no evidence suggested he is not the same as he was when dependency was established. [Mother] has made minimal effort[,] but the evidence is that no progress has been made to enable her to parent [Child]. … Finally, the evidence was unequivocal that [Child] is thriving and happy in the home of the [F]oster [P]arents. Termination therefore is in the best interests of [Child]. … In this regard, the evidence proved that the parents could not or would not remedy

- 14 -

the conditions which led to placement within a reasonable time[,] and that they have refused the services and assistance provided by the Agency.

Having concluded that the conduct of [Mother and Father] warrants termination of their parental rights, we are obliged to "engage in an analysis of the best interests of the child by taking into primary consideration the developmental, physical and emotional needs of the child[.]" *In re Adoption of R.J.S.*, 901 A.2d 502, 508 (Pa. Super. 2006).

In this case, [Child] was placed with his [F]oster [P]arents [just] days after he was born [in November 2016]. The undisputed evidence at [the] hearing established that there was no bond between [Child] and his natural parents. In this regard, [Mother] told [Tammy] Lucas[, a parent educator and employee with the Proud to be a Parent Program, that] she didn't have a bond with her son. (*See* Finding of Fact 62.) Contrariwise, the evidence at [the termination] hearing established a strong bond between [Child] and his [F]oster [M]other. No evidence suggested anything other than that the [F]oster [P]arents have provided outstanding care and love. The best interests of [Child] can only be served by allowing him to remain with his [F]oster [P]arents.

Trial Court Opinion, 10/24/18, at 23-25.

Further, in its Rule 1925(a) Opinion, the trial court set forth the following explanation regarding its concerns for Child's safety:

Judge Zanic ordered [Father] to participate in individual counseling, to successfully complete a parenting program[,] and to participate in a mental health evaluation.

Initially[,] [the Agency,] [through RDS,] provided reunification services to the parents of [Child] in the home they shared. However, the Agency quickly terminated home visits due to the anger and verbal assaults of [Father] toward the caseworker. The visits were thereafter scheduled in the offices of RDS.

The anger of [Father] manifested itself in the courtroom on May 5, 2017[,] during a permanency hearing. As a consequence,

Judge Zanic suspended the right of [Father] to visit with [Child] until a mental health professional provided evidence that it would be safe for [Father] to visit with [Child]. Since no evidence was ever proffered by [Father], he has not had any contact with [Child] since May 2017.

[Father] was examined by Dr. [] O'Hara, a clinical psychologist, on March 30, 2017[,] and again on December 18, 2017. [Dr. O'Hara] testified that [Father] suffers from a Bipolar II Disorder[,] which he said is a major mental disorder. [Dr. O'Hara] opined that he noted no improvement in [Father's] condition at the second examination. Finally, [Dr. O'Hara] said it would not be safe to allow [Father] to have unsupervised visits with [Child].

No evidence at the [t]ermination [h]earing suggested that the issues which led to a finding of dependency have been addressed or resolved.

The evidence presented sustained the Agency's burden of proof.

Trial Court Opinion, 12/11/18, at 1-2.

Upon review, we conclude that the trial court's decision to terminate Father's parental rights under subsections 2511(a)(8) and (b) is supported by competent, clear and convincing evidence in the record. *In re Adoption of S.P.*, 47 A.3d at 826-27. Additionally, we discern no abuse of discretion by the trial court in emphasizing Child's need for safety, and determining that the risk that Father posed outweighs any bond that might exist between Father and Child. *See In the Matter of S.B.*, *supra*.

Based upon the foregoing, we affirm the Decree terminating Father's parental rights with regard to Child under subsections 2511(a)(8) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>03/28/2019</u>